881 So.2d 940 (2004)
Larod ODEM, Appellant
v.
STATE of Mississippi, Appellee.
No. 2002-KM-01689-COA.
Court of Appeals of Mississippi.
September 7, 2004.
*942 Michael E. Robinson, attorney for appellant.
Office of the Attorney General by Charles W. Maris, attorney for appellee.
EN BANC.
GRIFFIS, J., for the Court.
¶ 1. Larod Odem was convicted of two counts of misdemeanor resisting arrest and was sentenced to serve two consecutive six month sentences, with the second six month sentence suspended. On appeal, he states the following issues:
A. Odem reasonably resisted an unlawful arrest and the charges should have been dismissed.
B. Odem's right to free speech was violated.
C. Odem was entitled to a directed verdict and/or judgment notwithstanding the verdict.
D. The trial court should have granted a new trial.
Finding no error, we affirm.

FACTS
¶ 2. On Saturday, February 5, 2000, Odem loaned his vehicle to his friend Christopher Harris. Harris was parked at a Canton car wash when officers from the Madison County Sheriff's narcotics unit approached Harris and others. Harris was arrested and charged with loitering and possession of a concealed weapon. Odem's vehicle was impounded.
¶ 3. Later that evening, Odem went to the Madison County Sheriff's Office to claim his vehicle. Deputy Sheriff Mark O'Cain responded to a dispatcher's call to come to the lobby of the sheriff's department to deal with an "irate" person in the lobby. O'Cain arrived and began a conversation with Odem. O'Cain testified that Odem was looking for his vehicle, and he was "very irate." O'Cain contacted Lieutenant James R. Marlett, the supervisor of the narcotics unit, to resolve Odem's concerns. Marlett instructed him to tell Odem to come to the sheriff's department on Monday morning with proof of ownership of the vehicle. O'Cain described Odem's demeanor as follows: "He was pretty excited. He was pretty wound up, using profane language. And at that time, I told him he would be arrested for disorderly conduct and disturbing the peace if he didn't leave the property." Odem complied and left.
¶ 4. On Monday morning, as instructed, Odem returned to the sheriff's department. Odem asked for Lieutenant Marlett, and he identified himself as the owner of the vehicle. Odem demanded the return of the vehicle.
¶ 5. Lieutenant Marlett testified that he explained the procedure that Odem would have to follow to retrieve the vehicle. *943 Marlett advised Odem that he would have to provide "proof of ownership, a title, registration, something showing ownership of the vehicle before we can release this vehicle to you." Odem told Marlett that the ownership papers were in the glove compartment of his vehicle and that the people at the impound lot would not let him retrieve them. Marlett offered to call the impound lot to allow Odem access to the vehicle to retrieve the ownership papers.
¶ 6. Upon learning that he would have to go back to the impound lot to retrieve the papers, Odem became agitated. Marlett provided the following testimony about the incident:
He became a little bit louder and a little more irate. He said, I have already been there. I tried to get the proper paperwork for this vehicle. They wouldn't let me get the paperwork. This is a bunch of.... This is a shit. He said, I've already been there to get this paperwork. They refused to let me get the paperwork out of my own vehicle. I said, well, I'll call. He said this is just a bunch of MF shit. I've already been up there one time to get the paperwork. He said, do you mean that I've got to go back up there, get the paperwork, bring it back to your office, show you the paperwork and then go back up there to get my vehicle? I said, yes, that's exactly what you'll need to do.
He said this is a bunch of F'ing shit that it seems like that I'm having to run back and forth. This is a bunch of sick shit that seemed like I am just harassed become of the paperwork or the vehicle. I said, no, we cannot release the vehicle without the proper paperwork.
And he became more agitated, and he started shouting.... And with all the swear words and loudness, he kept getting louder and louder, and I told him, I said, there's no need of this language. I will call Mr. Cannon [the owner of the towing company where the vehicle was located]. You can get your paperwork. But the next time that you utter cuss words like you're doing now, I'm going to place you under arrest for disorderly conduct.
He said, this is just a bunch of sick shit that I should not have to go through this, and I'm tired of it. And it seems like all you MF's are harassing us.
Marlett then informed Odem that he was under arrest for disorderly conduct.
¶ 7. Marlett claims that when he went around his desk to place Odem in handcuffs Odem shoved him, and he fell over his desk. As Odem was trying to leave, Deputy Sheriff Randall Tucker came to help Marlett and a scuffle ensued. Eventually, three deputies subdued Odem and placed him in handcuffs. Both Marlett and Tucker received minor scrapes and abrasions.
¶ 8. Deputy Tucker's testimony corroborated Lieutenant Marlett version of what happened. Tucker testified that he heard a loud voice and he went to Marlett's office. He testified that Odem told Marlett that he was a "sick mother f* * * er and that he was tired of being harassed by all these officers and, that we were sick and full of shit." Tucker then testified that Marlett told Odem that if Odem "kept on with those types of combative gestures that he would be placed under arrest."
¶ 9. Christopher Harris testified for Odem. He stated that he "vaguely remembered" the conversation between Marlett and Odem. Harris testified that everything was "very civil," and Odem's tone of voice was "calm, like a concerned parent about his child at school." Harris described Marlett as vulgar and claimed that Marlett had the mean demeanor and combative *944 behavior. Harris described the "whole incident" as "very hostile."
¶ 10. Odem then took the stand in his own defense. Odem testified that Marlett began their conversation by asking a number of questions about the weapon that was under the front seat, Odem's employment and the reason he had a Scott County tag on the vehicle when he lived in Madison County. Then, Odem testified to the following:
No curse words were said at this time. He asked me a question, and I said this is a sick situation. He said, you calling me sick, boy? I said, sir, I didn't call you sick.
He jumped up, he ran around and went out into the hallway and looked around. And by this time, Mr. Tucker was already in the room. He didn't come in when he heard us scuffle or some cursing. He came in and propped his leg up on the chair right beside me. And he stood there and heard some of the conversation. But he was not there when we started the conversation.
He came in and propped up. He walked past Mr. Tucker and went out into the hallway and looked as if he was looking to see was anybody out there. He looked and he came back and walked directly up in my face and pressed his nose up against my face.
... After he walked back in, he pressed his face up against my face and said, call me sick again, boy. If you say another word, I'm going to put you under arrest. I didn't say anything. He stepped back and grabbed me in my face and pushed me up in between there. Behind me is a wall and to the left of me is a filing cabinet. He grabbed me in the face and pushed me directly up in the filing cabinet. I fell across the chair. And when I came back, I pushed him off.
¶ 11. Odem was indicted on two counts of assault on a law enforcement officer, pursuant to Mississippi Code Annotated Section 97-3-7 (Supp.2003). The jury was instructed on simple assault on a law enforcement officer and the lesser-included offense of resisting arrest. The court also granted the following defense instruction:
The Court instructs the jury that a person has a right to use reasonable force to resist an unlawful arrest, or to aid another in resisting an unlawful arrest.
If you should find therefore, that Larod Odem did willfully, unlawfully, knowingly and feloniously cause bodily injury to Jim Marlett and Randy Tucker, but that this was done in resisting an unlawful arrest, and that the force he used was necessary under the circumstances, then you should find the defendant not guilty.
¶ 12. The jury returned a guilty verdict on two counts of resisting arrest.

DISCUSSION

A. Whether Odem reasonably resisted an unlawful arrest and the charges should have been dismissed.

B. Odem's right to free speech was violated.
¶ 13. Odem's argument of the first two issues intertwined. Odem argues that he was unlawfully arrested for his spoken words alone in violation of his right to freedom of speech guaranteed by the First Amendment to the United States Constitution. Thus, we address the first two issues together.

1. Standard of Review
¶ 14. Odem begins his argument with the following statement of the appropriate standard of review:
The standard of review of a trial judges denial of a motion to dismiss is substantial *945 or manifest error. Alexander v. Brown, 793 So.2d 601, 603 (Miss.2001). The evidence is to be considered fairly between the parties. Id.

Unfortunately, Alexander is not controlling precedent for the case now before us. Alexander was a case in chancery court, not a criminal case. The supreme court discussed the different standard of review for a M.R.C.P. Rule 41(b) involuntary dismissal from the standard for a motion for directed verdict. Alexander, 793 So.2d 601, 603(¶ 6). Alexander is simply not applicable here.
¶ 15. Instead, in Roberson v. State, 595 So.2d 1310, 1320 (Miss.1992), the supreme court held:
In considering motions to dismiss or motions for directed verdict on review, all evidence introduced by the prosecution is accepted as true, together with any reasonable inferences that may be drawn from that evidence, and, if there is sufficient evidence to support a verdict of guilty, the motion for a directed verdict must be overruled. Guilbeau v. State, 502 So.2d 639, 641 (Miss.1987).
Thus, we will follow the standard of review announced in Roberson.

2. Did Odem use reasonable force to resist an unlawful arrest?
¶ 16. Odem cites the principle that a person has a right to use reasonable force to resist an unlawful arrest. Boyd v. State, 406 So.2d 824, 826 (Miss.1981). Odem claims that the trial court erred because Odem contends he was resisting an illegal arrest.
¶ 17. Odem argues that this issue is controlled by this Court's decision in Brendle v. City of Houston, 759 So.2d 1274 (Miss.App.2000). In Brendle, Odem argues that this Court held that merely uttering vulgar, indecent or profane language in the presence of a law enforcement officer is not sufficient grounds to convict the defendant for profane language if that language does not rise to the level of fighting words. Brendle was arrested when, after telling a police officer, "I'm tired of this God d* * * police sticking their nose in s* * * that doesn't even involve them." Id. at 1276(¶ 2). Brendle also used the word "f* * *" in this exchange. Id. at 1284(¶ 32). Brendle was warned that he would be arrested if he used profane language again. He did, and he was arrested for the crime of public profanity. Id. at 1276(¶ 4). This Court found that Brendle's words did not constitute "fighting words,"and overturned his conviction. Id. at 1284 (¶¶ 32-33).
¶ 18. The State points out that the Mississippi Supreme Court has expressly declined to adopt our reasoning in Brendle. In Jones v. State, 798 So.2d 1241, 1248(¶ 14)(Miss.2001), the supreme court held:
In Brendle v. City of Houston, 759 So.2d 1274 (Miss.Ct.App.2000), Brendle was convicted of public profanity under Miss.Code. Ann. § 97-29-47 and resisting arrest. The Court of Appeals noted that it has been over 70 years since this Court has addressed the issue of what constitutes "profanity" and that we have not had an opportunity to interpret Mississippi's profanity statute. The Court of Appeals relied on other jurisdictions and the United State Supreme Court opinion of Cohen v. California 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), in overturning Brendle's conviction. The Court of Appeals found that Brendle did not use fighting words that would incite violence and therefore his subsequent arrest was not lawful. 759 So.2d at 1284. However, this Court is now reluctant to adopt the reasoning of the Court of Appeals under these facts, and finds the reasoning in Terry v. State[, 252 *946 Miss. 479, 173 So.2d 889 (1965)] to be dispositive of this issue. Based upon a careful review of the record, this Court finds that Deputy Newman, did not have sufficient evidence to believe that a breach of the peace was being threatened or a crime was about to be committed. Accordingly, all evidence of acts of resisting the unlawful arrest should be excluded.
Jones, 798 So.2d at 1248(¶ 14)(emphasis added).
¶ 19. Our review must begin with a determination of whether there was "sufficient evidence to believe that a breach of the peace was being threatened or a crime was about to be committed." Id. There are several important factual differences from this case and Jones and Brendle. Here, the conduct which lead to the arrest occurred at the sheriff's department, not while the deputy was out on patrol. Odem was arrested not for the crime of public profanity but for the crime of disorderly conduct or breach of the peace. Odem's language and his physical acts must be examined to determine whether he had an intent to breach the peace or whether he did in fact breach the peace. The cases are similar because Odem's language contained profane and vulgar words. However, there was testimony that the basis for the arrest was not solely based on his spoken words but also included consideration of his conduct, behavior and demeanor. Indeed, there was evidence that Odem was agitated, loud, irate, and was gesturing combatively. The State argues that Odem's language coupled with his behavior or conduct created a reasonable inference that a breach of the peace had occurred or was about to occur.
¶ 20. Odem and Marlett clearly had a confrontation that was at a stalemate. Odem wanted his car. Marlett told him what procedures he would have to follow to get the vehicle. Odem, visibly unhappy, began his conduct that indicated that he did not intend to follow the procedures. Instead, his behavior indicated that he was intent on creating a scene so that Marlett would not enforce the procedures and allow Odem to get his vehicle back immediately, without having to go to the impound lot, secure the proof of ownership, and return to the sheriff's department to prove that he in fact owned the vehicle and should be allowed to remove it from the impound lot. Deputy Tucker confirmed this when he testified that he "heard the language and cussing escalating." From this evidence, it was reasonable for the jury to determine that Odem was arrested not for his words alone but also for his combative conduct.
¶ 21. The State contends that Marlett had probable case to arrest Odem without a warrant for a breach of the peace threatened or attempted in his presence. The State cites three statutes of which Odem was in violation. First, Mississippi Code Annotated Section 97-35-3 (Rev.2000), in pertinent part, provides:
(1) Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby: ...
(b) insults or makes rude or obscene remarks or gestures, or uses profane language, or physical acts, or indecent proposals to or toward another or others, or disturbs or obstructs or interferes with another or others ...
shall be guilty of disorderly conduct, which is made a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not more than two hundred dollars ($200.00), or imprisonment in the county jail for not more than four (4) months, or by both such fine and imprisonment.
*947 Second, Mississippi Code Annotated Section 97-35-7 (Rev.2000), in pertinent part, provides:
(1) Whoever, with intent to provoke a breach of the peace, or under such circumstances as may lead to a breach of the peace, or which may cause or occasion a breach of the peace, fails or refuses to promptly comply with or obey a request, command, or order of a law enforcement officer, having the authority to then and there arrest any person for a violation of the law, to:
(a) Move or absent himself and any vehicle or object subject to his control from the immediate vicinity where the request, command or order is given, or ...
(i) Act or do or refrain from acting or doing as ordered, requested or commanded by said officer to avoid any breach of the peace at or near the place of issuance of such order, request or command, shall be guilty of disorderly conduct, which is made a misdemeanor and, upon conviction thereof, such person or persons shall be punished by a fine of not more than five hundred dollars ($500.00) or imprisonment in the county jail for not more than six (6) months, or by both such fine and imprisonment.
Finally, Mississippi Code Annotated Section 97-35-13 (Rev.2000), in pertinent part, provides:
Any person who shall enter any public place of business of any kind whatsoever, or upon the premises of such public place of business, or any other public place whatsoever, in the State of Mississippi, and while therein or thereon shall create a disturbance, or a breach of the peace, in any way whatsoever, including, but not restricted to, loud and offensive talk, the making of threats or attempting to intimidate, or any other conduct which causes a disturbance or breach of the peace or threatened breach of the peace, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not more than five hundred dollars ($500.00) or imprisoned in jail not more than six (6) months, or both such fine and imprisonment.
¶ 22. We agree with the State. There was sufficient evidence for Lieutenant Marlett to believe he had probable cause to arrest Odem. Therefore, we find that the arrest of Odem was a lawful arrest.

3. Was Odem's right to free speech violated.
¶ 23. Odem next asserts that the words he used in his exchange with Marlett encompassed constitutionally protected speech not subject to regulation by the State of Mississippi. In the landmark case of Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the United States Supreme Court held that there are definite and narrowly limited classes of speech which may be constitutionally punished. These include the lewd and obscene, the profane, the libelous and insulting, or "fighting" words which by their very utterance inflict injury or tend to incite an immediate breach of the peace. Id. at 571, 62 S.Ct. 766.
¶ 24. We do not consider whether Odem used lewd and obscene or libelous words. Obscene words are defined as those that appeal to prurient interests and are in some way erotic. There is nothing to indicate that Odem's words fell into these categories.
¶ 25. The Supreme Court has also held that profane words alone, unaccompanied by any evidence of violent arousal, are not fighting words, and are therefore protected speech. Cohen v. California, 403 U.S. *948 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). In Cohen, the court emphasized that even offensive and distasteful words must be protected, for "one man's vulgarity is another's lyric," and courts cannot make principled distinctions on matters of taste and style. Id. at 25, 91 S.Ct. 1780. The Cohen court continued by saying that it is the function of words to convey "not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well." Id at 26, 91 S.Ct. 1780. "The emotive function of an expletive `may often be the more important element of the overall message sought to be communicated;' so long as one does not incite violence, one should not be forced to express one's anger or disapproval in measured terms." Johnson v. Campbell, 332 F.3d 199, 212 (3d Cir.2003) (citing Cohen at 26, 91 S.Ct. 1780).
¶ 26. Although we have already determined that Odem was arrested based on his words together with his conduct, behavior and demeanor, we will nevertheless consider whether Odem's language constituted fighting words, not speech that is simply disputatious, emotionally charged, or profane. As stated above, fighting words are those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace. The probability of words inflicting injury or inciting an immediate breach of the peace tends to depend upon to whom the words are addressed.
¶ 27. Unfortunately, law enforcement officers must endure verbal abuse. In City of Houston v. Hill, 482 U.S. 451, 454, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), the supreme court held that a city ordinance that prohibited the interruption of a police officer in the performance of his duties to be unconstitutionally overbroad. The court commented that the First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers." Id. at 461, 107 S.Ct. 2502. The court went even further to declare, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." Id. at 462-63, 107 S.Ct. 2502.
¶ 28. In Lewis v. City of New Orleans, 415 U.S. 130, 134-36, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), Justice Powell wrote a concurring opinion where he suggested that the fighting words exception recognized in Chaplinsky might impose a more limited application in cases involving speech to a police officer. As he stated, "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." Id. at 135, 94 S.Ct. 970.
¶ 29. Here, unlike the cases cited, the confrontation occurred not out in public but at the sheriff's department. The concern behind this line of authority is that law enforcement officers must exercise discretion in the performance of their duties. Law enforcement officers must attempt to calm situations instead of escalate them. However, law enforcement officers must remain loyal to their oath.
¶ 30. Terry requires that law enforcement officers have probable cause to make an arrest. They may not simply take offense to words that are expressed at them in a tense situation. We believe it is important that Lieutenant Marlett neither initiated nor had an opportunity to walk away from Odem's words and combative conduct. Odem became agitated and began shouting profanities when Lieutenant Marlett told him about the protocol he would have to follow to retrieve his vehicle from the impound lot. Odem expressed his displeasure with the inconvenience. *949 Odem did not stop with simply expressing his displeasure. He was combative, and he created a stalemate that arose to the level of "fighting words" that were likely to inflict injury or incite an immediate breach of the peace. Indeed, Odem indicated no intent to back down until Lieutenant Marlett gave him his vehicle without following the proper procedure.
¶ 31. Yes, Lieutenant Marlett was expected to exercise a higher degree of restraint than the average citizen. Whether he exercised the proper restraint was a question for the jury. There was sufficient evidence to support the jury's finding that the arrest was lawful under the circumstances. Accordingly, we find that there is no merit to Odem's first two issues.

C. Whether the trial court erred in denying Odem's motions for directed verdict and for judgment notwithstanding the verdict.
¶ 32. Our standards of review for a denial of a motion for judgment notwithstanding the verdict and a directed verdict are identical. Under this standard, the court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. Coleman v. State, 697 So.2d 777, 787 (Miss.1997). If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. Id. On the other hand, if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. Id. at 788. It is not for this Court to pass on the credibility of witnesses, and where the evidence justifies the verdict it must be accepted as having been found worthy of belief. Grooms v. State, 357 So.2d 292, 295 (Miss.1978).
¶ 33. The State contends that Odem's motion for a directed verdict is not properly before this Court on appeal. After Odem's motion for directed verdict was denied at trial, he proceeded with his case by testifying himself and producing a witness to testify on his behalf. The State cites Holland v. State, 656 So.2d 1192 (Miss.1995) for the proposition that when the defendant proceeds with his case, after the state rests, and the court overrules the defendant's motion for a directed verdict, the defendant has waived the appeal of the directed verdict. This is not a correct reading of Holland.
¶ 34. The relevant language in Holland v. State, 656 So.2d 1192, 1197 (Miss.1995) reads as follows:
Despite the insufficiency of the evidence, Holland's attorney failed to renew his motion for a directed verdict at the close of Holland's case. When the defendant proceeds with his case after the state rests and the court overrules the defendant's motion for a directed verdict, the defendant has waived the appeal of that directed verdict. Esparaza, 595 So.2d at 426; Harrell v. State, 583 So.2d 963, 965 (Miss.1991). Furthermore, the defense failed to test the sufficiency of the evidence with a request for a peremptory instruction or a motion for a j.n.o.v. Generally, failure to make a contemporaneous objection at trial waives the issue on appeal. Ratliff v. State, 313 So.2d 386, 388 (Miss.1975). In the absence of a renewal of the directed verdict, a request for a peremptory instruction, or a motion for a judgment notwithstanding the verdict, Holland has waived the sufficiency error on appeal. Griffin v. State, 495 So.2d *950 1352, 1353 (Miss.1986); Peden v. State, 425 So.2d 1356, 1357 (Miss.1983); Harris v. State, 413 So.2d 1016, 1018 (Miss.1982).
(emphasis added). The key principle in Holland was that the issue of sufficiency of the evidence was waived because the defendant did not give the trial court an opportunity to consider it.
¶ 35. In Simon v. State, 857 So.2d 668, 690 (¶ 54-56)(Miss.2003), the supreme court clarified Holland when it held:
The last sub-issue concerns Simon's allegation that his trial counsel did not contest the State's proof that Simon broke into the Parker residence, necessary to prove burglary. He takes issue with the fact that, although trial counsel moved for a directed verdict at the close of the State's proof  specifically alleging that the State failed to make a prima facie case  counsel did not renew that motion at the close of all proof. Simon cites Holland v. State, 656 So.2d 1192, 1197-98 (Miss.1995), for the proposition that the failure to renew a motion for a directed verdict at the close of all proof constitutes ineffective assistance of counsel. Simon overstates the Holland rule.

In Holland, this Court was concerned with the fact that trial counsel had completely failed to give the trial court the opportunity to review the sufficiency of the evidence at the end of the trial. Not only did counsel fail to renew his motion for directed verdict at the close of all proof, he did not present the trial court with any post-trial motions which would have done the same (i.e. motion for judgment notwithstanding the verdict, request for a peremptory instruction, etc.). Id. at 1197.
Simon's counsel did file post-trial motions which challenged the legal sufficiency of the evidence, namely a motion for a judgment notwithstanding the verdict or a new trial. Although this motion does not raise the specific issue of whether the State had proven the breaking into element of burglary, the trial court stated upon being presented with the motion for directed verdict:
And also the death of Bobbie Joe Parker. The testimony was that she was shot, and there's ample evidence in this case of the crime of burglary of a dwelling house and the residence of the Carl Parker family.

The trial court denied the post-trial motion for judgment notwithstanding the verdict or for a new trial. It is clear that the trial judge considered the elements of burglary at the close of the State's presentation of evidence and at the end of trial and found the State's proof sufficient to support a verdict. Therefore, it was not ineffective assistance of counsel to fail to move the trial court for a directed verdict at the close of all proof or to fail to particularly stress the alleged lack of proof of one element in that motion or in post-trial motions.
(emphasis added).
¶ 36. The State is incorrect. The sufficiency of the evidence was preserved for appeal by Odem filing his motion for judgment notwithstanding the verdict. Nevertheless, in accordance with the appropriate standard of review and based on the evidence discussed in the preceding section, we find that the evidence was indeed sufficient to justify the verdict. Therefore, we find no merit to this issue.

D. Whether the trial court erred in denying Odem's motion for a new trial
¶ 37. Odem's final error contends that the trial court abused its discretion in denying the motion for a new trial. *951 A motion for a new trial should be granted only where the verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." Wetz v. State, 503 So.2d 803, 812 (Miss.1987). When reviewing the trial court's denial of a motion for new trial, all evidence favoring the State is accepted as true, and should not be reversed absent a clear abuse of discretion. Id. Here, as discussed in the previous sections, the verdict was not contrary to the overwhelming weight of the evidence. Therefore, we do not find that the trial court abused its discretion by denying Odem's motion for a new trial.
¶ 38. THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT OF CONVICTION OF RESISTING ARREST, COUNTS I AND II AND SENTENCE OF SIX MONTHS IN CAUSE NO. 2000-0411 ON COUNT I, AND SENTENCE OF SIX MONTHS IN CAUSE NO. 2000-0411 ON COUNT II, IN THE CUSTODY OF THE MADISON COUNTY SHERIFF PROVIDED, THE EXECUTION OF THE LAST SIX MONTHS IS STAYED AS PRESCRIBED AND THE SENTENCES SHALL RUN CONSECUTIVELY, AND TWO YEARS OF SUPERVISED PROBATION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES AND LEE, P.JJ., MYERS, AND CHANDLER, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J., AND BARNES, J.
IRVING, J., Dissenting.
¶ 39. The majority, accepting the State's position that Odem was not arrested solely because of the use of profanity directed at a law enforcement officer, affirms his conviction of two counts of resisting arrest. I believe the evidence, as revealed in the record, is overwhelmingly clear that the only reason Odem was arrested is that he used profanity toward a law enforcement officer. I further believe that our facts here are indistinguishable from those in the Mississippi Supreme Court case of Jones v. State, 798 So.2d 1241 (Miss.2001) and from those in our case of Brendle v. City of Houston, 759 So.2d 1274 (Miss.Ct.App.2000). In both of those cases, the defendant was arrested after peppering a law enforcement official with profanity. In Jones, the Mississippi Supreme Court found a lack of probable cause to support the arrest. In Brendle, we found that the profanity used did not constitute "fighting words" and therefore, did not give rise to probable cause to make an arrest for a violation of Mississippi's statute against public profanity.
¶ 40. It seems rather clear to me that if the law enforcement officials in Jones and Brendle did not have probable cause to arrest the defendant in those cases, the law enforcement official in this case did not have probable cause to arrest Odem. Consequently, I dissent.
¶ 41. In Jones, Richard Mark Jones, while sitting in the driver's seat of his Dodge Ram at the Pitt Stop Grocery in Raymond, twice called to Hinds County Deputy Donnie Newman asking Newman to approach Jones's truck. Jones's wife and two sons were in the truck with Jones. When Newman walked over to the truck, Jones asked, "Why did you kill my son?"[1] *952 Newman responded by directing Jones to take his family and leave the premises. Jones persisted with his questioning of Newman about his involvement in his son's death. Newman told Jones that he was not even on duty at the time of the incident. At that point, Jones started cursing and called Newman a "child killing m____ f____. What happened next is best related by quoting directly from the opinion as follows:
Deputy Newman said, "Richard, I am going to give you one more chance. You need to drive out of here with your family. No use in starting a scene here." At this point, Jones allegedly stuck his head out of the window and began yelling profanity and accusing Newman of having a hand in his son's death.
At this time, Deputy Newman instructed Jones to get out of his truck. When Jones asked Newman why, Newman responded, "You are under arrest." At which, Jones's wife screamed, "Don't get out. He is going to kill you." Newman again instructed Jones to step out of the vehicle. When Jones did not, Newman repeatedly attempted to pull open the driver's side door while instructing Jones to "Get out of the truck."
According to Deputy Newman, Jones finally threw the door open with all of his strength, knocking the deputy back three or four feet. Once he regained his composure, Newman claims he was confronted by Jones standing next to his truck with fists raised yelling, "Let's get it on." As Newman approached, Jones dropped his fist and said, "M____ f____, hit me. That's all I want you to do. Just lay a hand on me." A brief scuffle ensued as Newman wrestled to put handcuffs on Jones. Finally, Deputy Newman was able to cuff Jones and place him in the back of the patrol car. Newman also claims that Mrs. Jones joined in the altercation while the deputy was attempting to arrest her husband.
* * * *
Although he offered inconsistent statements, Newman testified at trial that he had seen the butts of some guns behind the passenger seat of Jones's truck. Once Jones was safely stowed in the patrol car, Newman returned to the truck. Mrs. Jones and Richard Lee Jones (and Deputy Newman's statements at the preliminary hearing) assert that Newman asked whether there were any guns in the vehicle before asking that the weapons be turned over. After a short bout of verbal fencing with both Mrs. Jones and the eldest son, Deputy Newman confiscated three weapons (a 12-gauge shotgun, an AR-15 Colt automatic rifle, and a nine-millimeter Smith & Wesson handgun).
Jones, 798 So.2d at 1246 (¶¶ 3-8).
¶ 42. As already mentioned, the Mississippi Supreme Court, after a careful review of the record, found that Deputy Newman did not have sufficient evidence to believe that a breach of the peace was being threatened or a crime was about to be committed. Consequently, the court determined the arrest was unlawful and held that "all evidence of acts of resisting the unlawful arrest should [have been] excluded." Id. at 1248(¶ 14).
¶ 43. In Brendle, Houston Police Officer Trances Ford accompanied Herbert Miller to William Brendle's mechanic shop so Miller could talk to Brendle about a business dispute. During an ensuing discussion that the two men had with Brendle, Brendle said to Officer Ford, "I'm tired of this God d____ police sticking their nose in s____ that doesn't even involve them." Officer Ford then warned Brendle not to use profanity again or he would *953 arrest him. Despite the warning, Brendle again used profanity towards Officer Ford. At that point, Brendle was arrested for using profanity. Prior to trial, the City of Houston amended the profanity charge to allege that Brendle "said the words `God d____' and `f____' in a public place  Chickasaw Mechanic, Inc.  and in the presence of two or more persons." Brendle was also charged with resisting arrest. He was convicted of both charges. Brendle, 759 So.2d at 1276 (¶¶ 2-6).
¶ 44. On appeal, this Court, in an opinion authored by Judge Lee reversed and rendered Brendle's convictions. In arriving at our decision, we said:
Brendle's language while vulgar, indecent, and arguably profane, did not rise to the level of "fighting words." His language was not "by its very utterance" sufficient to incite an immediate breach of the peace. This is not to say that shouting profanities at a police officer is appropriate or proper behavior in any circumstance. In fact, such conduct may give rise to a situation where an immediate breach of the peace may occur. However, the facts in this case do not support such a situation. Rather the testimony shows that some of the vulgarities used by Brendle were spoken as he turned away from Officer Ford attempting to return to his office. Even further, there was no evidence that Brendle's epithets sought to incite others to prevent his arrest. As such, we find that the circuit court committed manifest error in determining that Brendle's conduct gave rise to probable cause for his arrest for a violation of Mississippi's statute against public profanity.
Id. at 1284(¶ 32).
¶ 45. After finding that Brendle's arrest for public profanity was unlawful, we vacated his conviction for resisting arrest because the charge of resisting arrest presupposes an attempt to make a lawful arrest. Id. at (¶ 33).
¶ 46. In the case before us, Odem's misfortune began with the discovery of his car, by Lieutenant Marlett, in the parking lot of a car wash on Highway 43 North. As Lieutenant Marlett approached Odem's vehicle, one of the doors to the vehicle was partially opened, revealing the handle of a handgun protruding from under the front seat. The driver of the vehicle, Christopher Harris, advised that he was not aware of the gun's presence and that the vehicle did not belong to him. Apparently Harris gave Officer Marlett the owner's first name but could not recall the owner's last name. As Marlett was talking to Harris, another officer called in descriptive information on the vehicle in an effort to obtain the identity of the owner.[2] Based on the information tendered, the officers were advised that the vehicle belonged to Odem from Scott County.
¶ 47. Harris was arrested for possession of a concealed weapon, and Odem's car was towed. When Odem came to the Madison County Sheriff's Office in an attempt to obtain assistance in retrieving his car, Lieutenant Marlett described, in the following exchange, the pertinent events leading to Odem's arrest:
Q. Tell us what transpired that morning?
A. I was in the office, and this was probably about 8:30, or somewhere in that time frame. There was a call over the intercom stating that there were some people in the lobby requesting *954 to talk with me. And I went to the lobby, and Mr. Odem identified himself as the owner of the vehicle and demanded the return of the vehicle right there.
I explained to him, I said, you need to come on back to my office. We'll talk about it because we found a gun in the vehicle. The person driving your vehicle didn't know your name. He did get right the first name, but he didn't know the last name. And we'll have to address that situation and those items.
So we went to the office. And I told him, I said, Mr. Odem, I said, you will need to get proof of ownership, a title, registration, something showing ownership of the vehicle before we can release this vehicle to you. We can't just release it to anyone who walks off the street and states that I own this vehicle. I want my vehicle back.
He stated that he  this was in the office. He stated, I have already been to Cannon's. Evidently Officer O'Cain had told him where it was, and he knew where the vehicle was. And said, I've already been there, and the proper paperwork that I need is in the glove box of the vehicle. And I stated that I will call up there and tell Cannon's that you have a right to go in there and a need to come in there and retrieve the ownership papers and the registration papers, whatever it took.
He became a little bit louder and a little more irate. He said, I have already been there. I tried to get the proper paperwork for this vehicle. They wouldn't let me get the paperwork. This is a bunch of ...
Q. Please say it, please say what he said?
A This is a bunch of s____. He said, I've already been there to get this paperwork. They refused to let me get the paperwork out of my own vehicle. I said, well, I'll call. He said this is just a bunch of MF s____. I've already been up there one time to get the paperwork. He said, do you mean that I've got to go back up there, get the paperwork, bring it back to your office, show you the paperwork and then go back up there to get my vehicle? I said, yes, that's exactly what you'll need to do.
He said this is a bunch of F'ing s____ that it seems like that I'm having to run back and forth. This is a bunch of sick s____ that seemed like I am just harassed because of the paperwork or the vehicle. I said, no, we cannot release the vehicle without the proper paperwork.
And he became more agitated, and he started shouting. .... And with all the swear words and loudness, he kept getting louder and louder, and I told him, I said, there's no need of this language. I will call Mr. Cannon [the owner of the towing company where the vehicle was located]. You can get your paperwork. But the next time that you utter cuss words like you're doing now, that I'm going to place you under arrest for disorderly conduct.
He said, this is just a bunch of sick s____ that I should not have to go through this, and I'm tired of it. And it seems like all you MF's are harassing us. I think that's the words he used. And at that time, I told him, I informed him, I said, you are under arrest for disorderly conduct.
¶ 48. Officer Randall Tucker, who testified that he heard what transpired between Odem and Marlett, described the events leading up to Odem's arrest as follows:

*955 Q. Can you explain again what your part in it was?
* * * *
A. When I heard this loud voice, I got up and walked to the doorway to Lieutenant Marlett's office where Mr. Odem and Lieutenant Marlett were talking. Mr. Odem was standing just about at the end of Lieutenant Marlett's desk. Lieutenant Marlett was sitting in his chair. Mr. Odem repeatedly stated that he had been harassed and  he used several verbal obscenities 
* * * *
Q. Do you remember specifically what obscenities he was using?
A. Yes, sir, I do.
Q. I apologize for having you repeat it, but could you tell us what he was saying?
A. He told Lieutenant Marlett that he was a sick m____ f____ and that he was tired of being harassed by all these officers, that we were sick and full of s____.
Q. What if anything happened at that point?
A. Lieutenant Marlett told him that if he kept on with those types of combative gestures that he would be placed under arrest
Q. Was Mr. Odem placed under arrest? Or did you assist in attempting to place him under arrest?
A. Yes, sir, he made one other statement to Lieutenant Marlett that he was full of s____ and that he was tired of this. And Lieutenant Marlett told him he was under arrest and asked me if I had handcuffs. I told him, no, I didn't. He stated he had some there in his desk, he thought; that he would put handcuffs on him. When he reached for Mr. Odem, Mr. Odem backed away and shoved him in the chest with both hands. Lieutenant Marlett fell backwards on his desk. Mr Odem and I began, for lack of a better term, we got into a struggle, a fight. Once I saw him strike Lieutenant Marlett, I mean that's all I needed. There's no excuse for that.
¶ 49. Odem had quite a different version of what transpired. He testified that he sent Harris in his truck to the store to make a purchase. When Harris did not return after more than two hours, he went to the Madison County Sheriff Department looking for his vehicle. When he arrived at the sheriff's department, he asked if they had a Christian Harris under arrest. He was told that they did. Odem asked what was Harris arrested for. He was told that Harris was arrested for loitering at a car wash and for possession of an illegal weapon. Odem advised that the pistol belonged to him and that it was registered.
¶ 50. No one could tell him where his vehicle was located. He was told to come back at 8:30 a.m. on Monday morning and to bring Harris with him. On Monday morning, he and Harris arrived at the sheriff's department at 8:30 a.m. as Odem had been instructed. When Odem arrived at the sheriff's department, he identified himself as the owner of the blue Suburban and advised that he was there to pick it up. He was told that he needed to talk to Officer Marlett. He had to wait almost one hour before being allowed to speak with Officer Marlett. When Officer Marlett finally appeared, the following occurred:
He walked into the waiting areas where we was, and he said, are you here to see me, Bud? I said, are you Mr. Marlett. He said yes. I said *956 they told me I needed to see Mr. Marlett. He took me and Christian back in his office. There was no one else present in any other offices that we went to. Mr. Tucker was not there. We went in his office, and it was three chairs and a filing cabinet, his desk and the doorway.
Q. What happened when you got there?
A. I went in and sat down in the second chair. And Mr. Marlett went behind his desk, and Christian stood in the doorway. As soon as I walked in and sat down, Mr. Marlett started asking me about the pistol. Is this your pistol? I said, yes, it is. Do you have papers on this pistol? I said yes, sir, I do in the glove compartment of my vehicle. He said, you don't have papers on the pistol then, do you?
I said, sir, they're in the glove compartment of my vehicle, and you have my vehicle. I don't have your vehicle. I took a deep breath. I said, sir, someone abducted my vehicle Saturday night, and the papers are in the glove compartment of my vehicle. Well, you don't have the papers to the pistol then, do you.
* * * *
(Mr. Robinson, Continuing) So after he stated that since you didn't have papers with you right then and they were in the glove compartment, you didn't have paperwork for the gun, what happened after that?
A. I told him, sir, the serial number is on the pistol. It's registered with the Scott County Sheriff's Department. You can call and get verification on it. And then he said something else. I don't remember what he said. I said, sir, you can keep the pistol. I just want to get my truck so I can go back to work. He said, "Oh, you work?"
And I had on my work uniform and Canton Butane hat on and work clothes. I said yes, sir, I work at Canton Butane. Well, I just admire a person who works. I said, sir, I don't like being harassed for nothing. I said I haven't done anything to anyone. I just want to get my truck so I can go back to work.
Well, you can't have your truck. I said, sir, why can't I have my truck? Because you got Scott County license plates on that truck. I said, sir, I'm from Scott County. I just started working at Canton Butane a few short months ago. I don't live here. I don't have an address here. My girlfriend stays here, and I'm back and forth from Scott County to here.
Q. You didn't tell him you lived here in Canton?
A. No, never told him I lived here. He went on and questioned me about where my clothes were, where was my furniture, where did I stay. I said, sir, I don't stay here. I stay with my mother and I drive back and forth, and I spend some time with my girlfriend here.
Q. What did he say?
A. He said, well, I'm going to prove to you that you got to have Madison County license plates. I'm going to call the insurance bureaus. He picked up the telephone and immediately hung it up, he jumped up from behind his desk like he was coming toward me, and I stood up.
Q. At this point, had you used any curse words?
A. No curse words were said at this time. He asked me a question, and I said this is a sick situation. He said, *957 you calling me sick, boy? I said, sir, I didn't call you sick.
He jumped up, he ran around and went out into the hallway and looked around. And by this time, Mr. Tucker was already in the room. He didn't come in when he heard us scuffle or some cursing. He came in and propped his leg up on the chair right beside me. And he stood there and heard some of the conversation. But he was not there when we started the conversation.
He came in and propped up. He walked past Mr. Tucker and went out into the hallway and looked as if he was looking to see was anybody out there. He looked and he came back and walked directly up in my face and pressed his nose up against my face.
After he walked back in, he pressed his face up against my face and said, call me sick again, boy. If you say another word, I'm going to put you under arrest. I didn't say anything. He stepped back and grabbed me in my face and pushed me up in between there. Behind me is a wall and to the left of me is a filing cabinet. He grabbed me in the face and pushed me directly up in the filing cabinet. I fell across the chair. And when I came back, I pushed him off.
Q. Okay. So prior to him shoving you in your face, had you raised your hand yet?
A. I had not made the first motion.
Q. Had you been loud and cursing and belligerent?
A. He asked me one time, why are you using that tone of voice with me. I said, sir, I'm hoarse. He said, you need to quiet your tone down. I took a deep breath, and I did not holler the first time.
Q. After I shoved him off of me, Randy Tucker grabbed me in a headlock. Mr. Marlett got up from behind  after falling over the desk, he got up from behind me and came toward me and started kicking me. And I grabbed him in the collar and held him off of me while Mr. Tucker had me in the headlock. They both were trying to throw me on the floor, and I didn't let them throw me down.
So after they couldn't throw me down, Mr Tucker steps back and nails me in the face as hard as he could, and I still got Mr. Marlett in the collar because I wouldn't let him get any closer to me because they were trying to throw me down. By this time, Christian [Harris] was hollering, somebody come and help, somebody come and help.
Randy Tucker turns around and tells him, get out of here, you don't want none of this s____, boy. You're in the Madison County Jail and we don't take this s____ around here. They made him go out.
¶ 51. Given the fact that the officers established before towing Odem's vehicle that the vehicle belonged to Odem, his testimony  that he was questioned not about documents to prove ownership of the vehicle, but about documents to prove ownership of the pistol  is certainly very logical and consistent. This conclusion is buttressed and corroborated by (1) the fact that the officers had arrested Harris for possession of a concealed weapon, (2) the instruction to Odem to bring Harris with him on Monday when he came to the sheriff's department, and (3) Officer Marlett's testimony that he told Odem, "you need to come on back to my office. We'll talk about it because we found a gun in the vehicle."
¶ 52. Despite the rather compelling testimony by Odem, for purpose of our decision, we are duty bound to take the *958 testimony most favorable to the State in resolving the issue before us. Therefore, for purpose of this opinion, I have accepted the State's version of the facts. Even accepting the officer's version of the facts, it is rather clear to me from the above colloquies that, notwithstanding Marlett's assertion that he was arresting Odem for disorderly conduct, he really was arresting him because of the profanity hurdled at him by Odem. It is evident that Odem was not disorderly unless his use of profanity is considered one and the same as disorderly conduct.
¶ 53. While Marlett said that he placed Odem under arrest for disorderly conduct, he also testified that he said to Odem, "You can get your paperwork. But the next time that you utter cuss words like you're doing now, that I'm going to place you under arrest for disorderly conduct." I might add that the record before us contains no affidavit charging Odem with disorderly conduct. Odem was indicted for assault on Officers Marlett and Tucker while the officers were acting within the scope of their duties as law enforcement officers. The scope of the their duties is not detailed in the indictment. Presumably, those duties were their efforts to effect Odem's arrest for disorderly conduct. It is indeed strange that Odem has not been prosecuted for the offense allegedly giving rise to his arrest. As already noted, he was indicted and prosecuted for assault on Officers Marlett and Tucker, charges which the jury refused to salute.
¶ 54. But, whether Odem was arrested for disorderly conduct, as Marlett contends, or whether he was arrested for using profanity toward Marlett, as the record bears out, one thing is not debatable: there was no probable cause for arresting Odem. If there was no probable cause for arresting the defendant in Jones, who had three passengers and three guns with him at the time he cursed the officer and challenged the officer to a fight in a public place, the issue of probable cause in this case is not even close. Odem had no gun and three passengers to use them. Additionally, he neither challenged Marlett to a fight nor instigated the incident as did the defendant in Jones. All he wanted was his truck so he could go to work. Marlett knew the truck belonged to Odem. Yet, for some inexplicable reason, Marlett refused to release Odem's truck. Odem was without the use of his truck for the weekend. He followed orders to return to the sheriff's department on Monday morning. He did so but was again denied his truck. He should not now be denied any portion of his freedom.
¶ 55. For the reasons presented, I vehemently dissent. I would reverse and render Odem's convictions.
KING, C.J., AND BARNES, J., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Jones had a history of conflict with the Hinds County Sheriff's Department over what he believed to be the department's involvement in the death of his son who had been killed in an automobile accident two years earlier.
[2] The record does not reflect the name of the entity to which the call was made, but it is clear that the call was made to some authoritative source, perhaps the dispatcher for the sheriff's office.