936 So.2d 368 (2005)
Dextor Latroy JORDAN, Appellant
v.
STATE of Mississippi, Appellee.
No. 2002-KA-02057-COA.
Court of Appeals of Mississippi.
November 8, 2005.
Rehearing Denied January 17, 2006.
*369 Imhotep Alkebu-Lan, Chokwe Lumumba, Jackson, attorneys for appellant.
Office of the Attorney General by John R. Henry, attorney for appellee.
EN BANC.
BRIDGES, J., for the Court.

PROCEDURAL HISTORY
¶ 1. The Circuit Court for the Second Judicial District of Hinds County tried Dexter Latroy Jordan on two charges of kidnaping, two charges of sexual battery and one charge of rape. On November 6, 2002, the jury found Jordan guilty of all five counts. The circuit court sentenced Jordan to a one hundred sixty (160) year term in the Mississippi Department of Corrections. Jordan filed unsuccessful motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial. Aggrieved, Jordan appeals and raises three issues, listed verbatim:
I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED JORDAN'S MOTION FOR DIRECTED VERDICT.
II. THE ONE COUNT OF RAPE AND TWO COUNTS OF SEXUAL BATTERY AND RAPE ARE DUPLICITOUS AND SHOULD HAVE BEEN COMBINED.
III. THE SENTENCE OF ONE HUNDRED AND SIXTY YEARS *370 CONSTITUTE [SIC] CRUEL AND UNUSUAL PUNISHMENT.
Finding no error, we affirm.

FACTS
¶ 2. Jordan was charged with rape and two counts of sexual battery of D.W. Additionally, the State alleged that Jordan kidnaped D.W. and her son, K.W. On July 22, 2000, D. W., a nurse's assistant at Whitfield Mississippi State Hospital, got off work at 11:30 p.m. Vanessa Green babysat K.W. for D.W.D.W. picked up K.W. and took K.W. to visit his father, Lanthony Smith. Lanthony was going to keep K.W. while D.W. went shopping. D.W. arrived at Lanthony's apartment in Jackson, Mississippi, shortly after midnight.
¶ 3. D.W. got out of her car and got K.W. out of his car seat. D.W. dropped K. W.'s bottle, so she bent down to pick it up. As she stood up, a man wearing all black and a black ski mask confronted D.W. with a pistol. He ordered D.W. back into her car, and pushed her as she entered her driver's side door. He put K.W. in the back seat and told D.W. to drive. D.W. complied and left the apartment complex. D.W. proceeded down Lynch Street, avoided a police precinct, and continued towards Springridge Road. The gunman became frustrated at D.W.'s inability to drive the speed limit. When they got to Springridge Road, the gunman ordered D.W. to pull over. They switched seats and he continued to drive.
¶ 4. The gunman, still threatening D.W. with a pistol, told her to undress. D.W. lost her bearings, but she remembered a sign for "Raymond-Bolton Road." They eventually ended up in a wooded area in Bolton that D.W. did not recognize. D.W. did remember that she heard running water and that the gunman said he visited that area to fish.
¶ 5. The gunman got out of the car and forced D.W. to join him. The gunman, still wearing the ski mask, put the pistol barrel in K. W.'s mouth. Then the gunman made D.W. perform oral sex. That act led to the first sexual battery charge. The gunman also sodomized D.W. That act led to the second sexual battery charge. Finally, the gunman forced D.W. to have intercourse with him. That act led to the rape charge.
¶ 6. Afterwards, the gunman told D.W. that his name was Bruce Andrews. D.W. promised that she would not turn him in, so Andrews removed his ski mask. D.W. testified that Andrews left the mask and the pistol at the scene of the rape. Then she and Andrews left the wooded area and went to a trailer. According to D. W., Andrews told her to bring $200 to the trailer on the following morning.
¶7. Next, Andrews drove D. W.'s car to a BP gas station in Bolton, Mississippi. According to D. W., she was still undressed. They saw two Bolton police officers at the gas station. D.W. testified that Andrews took K. W., put him in a car parked behind hers, and told D.W. she had better not "do anything stupid." Then, Andrews spoke to one of the police officers, went inside and paid for D. W.'s gas, and pumped gas into her car. Andrews retrieved K. W., drove D. W.'s car near a pay phone, and told D. W., still undressed, how to get back to Jackson. Andrews then got in a car with another man.
¶ 8. D.W. traveled West on I-20. Around Clinton, Mississippi, Deputy Trey Brister of the Hinds County Sheriff's Department, stopped D.W. for speeding. D.W. told Deputy Brister what happened, but Deputy Brister testified that D.W. told him the gunman's name was Michael Green. D.W. never mentioned the name Michael Green *371 during her testimony. She always referred to the gunman as "Bruce Andrews."
¶ 9. Deputy Brister escorted D.W. to the University of Mississippi Medical Center (UMC) in Jackson. While at UMC, Amy Thweatt, a registered nurse and a sexual assault nurse examiner, performed a rape kit on D.W. That rape kit resulted in a positive identification for semen, but no one performed a DNA analysis to connect that finding to Jordan. D.W. later identified Jordan from a photographic lineup.
¶ 10. Deputy Brister contacted the gas station. Howard Shelby, an off-duty police officer with the Bolton Police Department, was working security at the gas station when D.W. stopped. Officer Shelby was still working when Deputy Brister contacted the gas station. Deputy Brister described Andrews/Green.
¶ 11. Officer Shelby remembered D. W.'s car and Officer Shelby also remembered Andrews/Green. However, Officer Shelby knew Andrews/Green as "Jordan." Officer Shelby knew where Jordan lived, so he and Officer Richard Dean went to Jordan's house. When they arrived, Fernando Jones was backing out of Jordan's driveway and Jordan was walking towards his trailer. The officers blocked Jones's car and called to Jordan. Jordan ran into the woods behind his trailer and evaded the two officers. However, Jordan turned himself in the next day.
¶ 12. Jordan pled "not guilty" and the matter proceeded to trial. At trial, Jordan claimed that he did not kidnap D.W. or K.W. Jordan said he avoided the two officers because he was on probation and had outstanding traffic tickets. He said he ran from the officers because he did not know what Officers Shelby and Dean wanted. He admitted that he was in D. W.'s car that night, as was K. W., but he claimed that he did not kidnap them. Jordan testified that D. W., his girlfriend, consented to, if not desired, his presence. Jordan claimed that, on previous occasion, he kept K.W. when D.W. needed to leave him with someone.
¶ 13. Jordan claimed that he did not force oral sex, sodomy, or intercourse on D.W. Jordan said he had intercourse with D.W. on that night, but Jordan testified that D.W. consented. According to Jordan, D.W. was his girlfriend at the time, though he had numerous girlfriends.
¶ 14. Jordan presented a "scorned woman" defense. Jordan claimed D.W. invented the charges because she got mad at him. According to Jordan, D.W. wanted Jordan to commit to a monogamous relationship with her and her only. However, Jordan had many girlfriends and did not want to commit. Jordan's defense strategy centered on the notion that D.W. said she would get even with him for his decision to avoid commitment. Further, the theory of Jordan's defense rested on the proposition that D.W. invented the charges against him as a method of revenge.
¶ 15. Jordan presented evidence that corroborated his version. Jordan testified that he knew D.W. and K.W. well before the events detailed above. Jordan somehow knew that K.D. suffered from asthma and needed periodic breathing treatments. Police never recovered a pistol or mask that matched those in D. W.'s description. Darlene Jordan, Jordan's mother, testified that she and D.W. visited Leonie Jordan, Jordan's maternal grandmother at the same time. Not only that, Darlene testified that Jordan told her he wanted to marry D. W.
¶ 16. Jennifer Jordan, Jordan's aunt, testified that she saw D.W. and Jordan together in the parking lot of her apartment. Lenore Fox, Jordan's girlfriend at the time of the trial, testified that she also *372 saw D.W. with Jordan. Finally, Wesley Reeves, an investigator with the Hinds County Sheriff's Office, testified that he could not locate the wooded crime scene in Bolton, though he had the scene confined to a general area.
¶ 17. Nevertheless, the jury weighed the conflicting evidence and found D.W. and the evidence suggesting guilt more credible. As mentioned, Jordan filed an unsuccessful motion for a directed verdict under Rule 50 of the Mississippi Rules of Civil Procedure. In Jordan's first issue, he asks this Court to review the circuit court's decision.

ANALYSIS

I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED JORDAN'S MOTION FOR DIRECTED VERDICT.
¶ 18. In his first issue, Jordan challenges the circuit court's decision to overrule his motion for a directed verdict. The State claims Jordan failed to preserve this issue. We address that claim first, because it would be unnecessary to consider the merits of Jordan's claim if he failed to preserve the issue.

A. Did Jordan Preserve this Issue?
¶ 19. Jordan filed an unsuccessful motion for directed verdict after the State's case-in-chief. Jordan then presented his case. When a defendant files a motion for directed verdict, then presents his case, that defendant waives his motion for directed verdict. Odem v. State, 881 So.2d 940(¶ 34) (Miss.Ct.App.2004). However, Jordan subsequently filed a motion for judgment notwithstanding the verdict. When a criminal defendant files an unsuccessful motion for a directed verdict, then presents his own evidence, and later files a motion for judgment notwithstanding the verdict, that motion for JNOV preserves the defendant's challenge of the sufficiency of evidence. Id. at (¶ 36). As such, Jordan preserved his challenge of the sufficiency of the evidence. Next, the State claims Jordan did not specifically object to the sufficiency of the evidence of venue.

B. Did Jordan Object with Sufficient Specificity?
¶ 20. To be sure, a motion for a directed verdict must be specific and not general in nature. Banks v. State, 394 So.2d 875, 877 (Miss.1981). "A motion for a directed verdict on the grounds that the state has failed to make out a prima facie case must state specifically wherein the state has failed to make out a prima facie case." Id. The same reasoning applies to a motion for JNOV. "In the absence of such specificity, the trial court will not be put in error for overruling same." Id. This also applies to venue. Failure to object to improper venue amounts to a waiver of the objection. Burnett v. State, 876 So.2d 409 (¶ 14) (Miss.Ct.App.2003).
¶ 21. Jordan filed his motion for judgment notwithstanding the verdict on February 4, 2004. By that motion, Jordan claimed (1) "[t]he Court erred in its failure to sustain the motion of Jordan for a directed verdict;" (2) "[t]he jury verdict was against the overwhelming weight of the evidence" and; (3) "Jordan is entitled to judgment notwithstanding the verdict due to the failure of the prosecution to prove a prima facie case on the counts of kidnapping, rape and sexual battery beyond a reasonable doubt[.]"
¶ 22. Clearly, Jordan's motion is a general objection. His motion never specifically challenges the sufficiency of the evidence of jurisdiction. That is, Jordan did not specifically claim that the prosecution failed to present sufficient evidence of jurisdiction or venue. Jordan's motion for JNOV is vague and general at best. Thus, *373 this issue is barred. Banks, 394 So.2d at 877. Procedural bar notwithstanding, we find that this issue lacks merit, as well.

C. Did the Trial Court Have Jurisdiction Over Jordan?
¶ 23. Jordan challenges the sufficiency of evidence of the circuit court's jurisdiction over him. Jordan references Deputy Reeves's failure to relocate the crime scene and claims the record lacks testimony or other evidence that he committed a crime in Mississippi. Jordan suggests that the State did not prove that any of the acts charged occurred in Mississippi. As a result, he concludes that no Mississippi court had jurisdiction over him, including the circuit court.
¶ 24. While reviewing challenges to the sufficiency of the evidence, we are mindful of our standard of review. Appeals from an overruled motion for directed verdict challenge the sufficiency of the evidence. Grihim v. State, 760 So.2d 865(¶ 6) (Miss.Ct.App.2000). In reviewing such a challenge, we consider the evidence in the light most consistent with the verdict. Carr v. State, 655 So.2d 824, 837 (Miss.1995) (quoting Roberson v. State, 595 So.2d 1310, 1318 (Miss.1992)). We give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence. Id. If we conclude that reasonable jurors could not have found beyond a reasonable doubt that Jordan was guilty, then we must reverse Jordan's conviction. Otherwise, we must affirm. Id.
¶ 25. First, it is helpful to note that there are five charges involved in this case. According to the record, Jordan kidnaped D.W. in Jackson. Jackson is in the First Judicial District of Hinds County. Then Jordan transported D.W. to Raymond, where he raped and sexually battered her. Raymond is in the Second Judicial District of Hinds County. We separate the sufficiency of the evidence according to the charges.
¶ 26. As for kidnaping, "[e]very person who shall be accused of kidnapping may be indicted and tried either in the county where the offense may have been committed, or in any county into or through which any person so kidnapped or confined shall have been taken while under such confinement." Miss.Code Ann. § 99-11-13 (Rev. 2000). D.W. testified that Jordan kidnaped her and K.W. in Jackson and took them to Raymond. While Jackson and Raymond are in the same county, three statutory provisions coincide to resolve the matter.
¶ 27. First, judicial districts are treated like counties. McGowan v. State, 742 So.2d 1183(¶ 4) (Miss.Ct.App.1999), and Section 99-11-19 (Rev.2000) of the Mississippi Code refers to offenses committed partly in one county and partly in another. In such an event, "the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecutions hall be first begun." Miss.Code Ann. § 99-11-19 (Rev.2000). Thus, the State could have prosecuted Jordan in either the First or Second Judicial District of Hinds County. Since the State prosecuted Jordan in the Second Judicial District of Hinds County, there was sufficient evidence of the circuit court's jurisdiction over the kidnaping charges.
¶ 28. As for the rape and sexual battery charges, Section 99-11-37(2) of the Mississippi Code refers to crimes committed in the particular districts of Hinds County. "[A]ll crimes . . . committed in Hinds County shall be cognizable in the court of either judicial district of the county, and such court shall have jurisdiction of the same." Miss.Code Ann. § 99-11-37(2) (Rev.2000). "Any and all proceedings may be conducted in either judicial district." *374 Id. Accordingly, the State could have prosecuted the rape and sexual battery charges in either the First or Second Judicial District of Hinds County.
¶ 29. Finally, Section 99-11-3(1) of the Mississippi Code addresses venue. According to Section 99-11-3(1), "[t]he local jurisdiction of all offenses, unless otherwise provided by law, shall be in the county where committed. But, if on the trial the evidence makes it doubtful in which of several counties, including that in which the indictment or affidavit alleges the offense was committed, such doubt shall not avail to procure the acquittal of the defendant."
¶ 30. We find no merit to Jordan's first issue.

II. THE ONE COUNT OF RAPE AND TWO COUNTS OF SEXUAL BATTERY AND RAPE ARE DUPLICITOUS AND SHOULD HAVE BEEN COMBINED.
¶ 31. In his second issue, Jordan claims the sexual battery and rape charges are duplicitous, giving rise to a double jeopardy violation. Jordan says the elements of rape are the same elements as sexual battery because both require a sex act against a victim's will.
¶ 32. Double jeopardy consists of three separate constitutional protections. White v. State, 702 So.2d 107(¶ 9) (Miss.1997). "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." Id. "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." Blockburger v. U.S., 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). There is no merit to Jordan's claim. The jury found Jordan guilty of one charge of rape and two charges of sexual battery. The rape charge was incident to forced intercourse and the two sexual battery charges followed forced oral sex and sodomy. Rape and sexual battery are not duplicitous. Rape is forcible sexual intercourse. Miss.Code Ann. § 97-3-65(4)(a) (Rev.2000). In the context of rape, "sexual intercourse" means "a joining of the sexual organs of a male and female human being in which the penis of the male is inserted into the vagina of the female." Miss.Code Ann. § 97-3-65(6) (Rev.2000). Sodomy could never qualify with the statutory definition of rape. Likewise, oral sex could never fall within the statutory meaning of rape.
¶ 33. As for sexual battery, "[a] person is guilty of sexual battery if he or she engages in sexual penetration with . . . [a]nother person without his or her consent." Miss.Code Ann. § 97-3-95(1)(a) (Rev.2000). Thus, sexual battery, involves unconsented "sexual penetration." "Sexual penetration" could include intercourse, sodomy, or fellatio. 97-3-95(1)(a); 97-3-97(a) (Rev.2000). The three charges clearly allege three distinctly separate acts. Accordingly, the charges are not duplicitous and they do not expose Jordan to double jeopardy.

III. THE SENTENCE OF ONE HUNDRED AND SIXTY YEARS CONSTITUTE [SIC] CRUEL AND UNUSUAL PUNISHMENT.
¶ 34. Jordan concedes that he did not object to his sentence at sentencing or in his post trial motion. "If the appellant did not present to the trial court the proposition that his sentence was unconstitutional, he may not assert that allegation on appeal, and it is procedurally barred." Ivory v. State, 840 So.2d 755 (¶ 9) (Miss.Ct. *375 App.2003). Accordingly, this issue is procedurally barred.
¶ 35. Procedural bar notwithstanding, "[s]entencing is within the complete discretion of the trial court and not subject to appellate review if it is within the limits prescribed by statute." Coleman v. State, 788 So.2d 788(¶ 12) (Miss.Ct. App.2000). "Further, the general rule in this state is that a sentence cannot be disturbed on appeal so long as it does not exceed the maximum term allowed by statute." Id. Jordan admits that the circuit court sentenced him to the maximum sentence for each count. Since Jordan's sentence for any one count is not greater than the maximum sentence for that count, this Court may not disturb Jordan's sentence on appeal.
¶ 36. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF COUNT 1 OF KIDNAPING AND SENTENCE OF THIRTY YEARS; COUNT II OF KIDNAPING AND SENTENCE OF THIRTY YEARS; COUNT III RAPE AND SENTENCE OF FORTY YEARS; COUNT IV SEXUAL BATTERY AND SENTENCE OF THIRTY YEARS; COUNT V SEXUAL BATTERY AND SENTENCE OF THIRTY YEARS. ALL TO RUN CONSECUTIVELY TO EACH SENTENCE IN EACH COUNT, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.