# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-60357

United States Court of Appeals
Fifth Circuit

**FILED**
February 11, 2016

Lyle W. Cayce
Clerk

GREGORY BROOKS,

Plaintiff - Appellant

v.

CITY OF WEST POINT, MISSISSIPPI; JIMMY BIRCHFIELD; WILLIAM SPRADLING,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:12-CV-190

Before DENNIS, PRADO, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:*

Gregory Brooks filed this 42 U.S.C. § 1983 suit against West Point, Mississippi police officers Jimmy Birchfield and William Spradling, alleging that the officers violated his constitutional rights by unlawfully arresting him without probable cause, by unlawfully arresting him in retaliation for his exercise of freedom of speech, and by using excessive force upon him. The

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-60357

district court granted summary judgment in favor of both defendants on the ground of qualified immunity. We affirm in part and reverse in part.

I.

We summarize the evidence in the light most favorable to Brooks. The dispute began when Brooks called 911 to complain of harassing phone calls from his sister in Atlanta, and Birchfield responded to Brooks's home. When Birchfield told Brooks that he could not immediately press charges, Brooks became angry and used curse words and other disrespectful language in telling Birchfield to get off his property, but did not verbally or physically threaten Birchfield or make any threatening, combative or other overt gesture toward him. The exact words Brooks used are disputed.[1]

Birchfield then told Brooks that he was "fixing to go to jail for disorderly conduct" and called for backup; while he was waiting in his car for a second officer, he told Brooks's wife and daughter—who had come out to talk to him— that Brooks would be arrested for disorderly conduct. When Spradling arrived, the two officers knocked on Brooks's front door and asked him to come outside, planning to arrest him for disorderly conduct. Brooks ran out of the house through a different door and moved quickly toward the officers, demanding to know why the officers were banging on his door (again, using some level of expletive that the parties dispute).

Here, accounts of the incident diverge. Brooks and two of his family members testified that Spradling quickly grabbed Brooks's arms and pulled them behind his back, and that Brooks put his hands up only to block the impact of Birchfield, who ran into Brooks and then yelled that he was going to

---

[1] Birchfield maintains that Brooks said, "I don't like your punk ass no way," and "just get your mother fucking ass out of my yard." Brooks does not recall saying those words and denies that he would ever do so, but does admit telling Birchfield to "get the hell off [his] property."

charge him with assaulting an officer or resisting arrest.  On the other hand, Spradling testified that he grabbed Brooks only after Brooks had first "shoved" Birchfield.  And Birchfield testified that almost as soon as Brooks exited his home, he told Brooks that he was under arrest and to put his hands behind his back; Spradling then grabbed Brooks, who pulled free and "came at" and "pushed" Birchfield.

After that disputed stage of the second encounter, the officers took hold of Brooks, pushed him against the garage door, and forced him to the ground, resulting in abrasions on his hands and knees.  Once Brooks was on the ground, he was handcuffed and led to Spradling's squad car.  Brooks complained of pain in his back and neck, so the officers had an ambulance take him to a hospital, where he was treated for abrasions.  Brooks also claims that the incident exacerbated his Post-Traumatic Stress Disorder (PTSD) symptoms.

## II.

We review a district court's summary judgment decision *de novo*.  *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).  We employ a two-pronged inquiry to resolve questions of qualified immunity at summary judgment.  "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam) (alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The second prong "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 1866.

Because the non-moving party's disputed evidence must be credited on a motion for summary judgment, the district court erred in dismissing on the

basis of qualified immunity Brooks's claim that he was arrested without probable cause. "The right to be free from arrest without probable cause is a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994). We look to the moment Brooks was arrested to determine whether the officers could have reasonably believed that they had probable cause—that "there was a fair probability that [Brooks] had committed or was committing an offense." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 656 (5th Cir. 2004); *see United States v. Tinkle*, 655 F.2d 617, 623 (5th Cir. Unit A 1981) ("The critical time is the moment of arrest, not the moment the officer makes the decision to arrest.").

It is regrettable when police are summoned and respond, only to be cursed. But viewing the facts at the time of arrest in the light most favorable to Brooks, no reasonable officer could have believed that he could arrest Brooks solely because of the words he used during his first encounter with Birchfield, which constituted neither "fighting words" punishable under the First Amendment nor disorderly conduct under Mississippi law. *See City of Houston v. Hill*, 482 U.S. 451, 461–63 (1987); *Gooding v. Wilson*, 405 U.S. 518, 521–28 (1972); *Jones v. State*, 798 So. 2d 1241, 1247–48 (Miss. 2001) (en banc) (holding that a defendant's profane remarks to a police officer could not have given the officer reason to believe that a breach of the peace had occurred); *Brendle v. City of Houston*, 759 So. 2d 1274, 1283–84 (Miss. Ct. App. 2000) (en banc) (holding that curse words addressed to a police officer were not fighting words punishable under Mississippi profanity statute). And although Spradling and Birchfield's disputed versions of the events after they knocked on Brooks's door might support a finding that the officers had probable cause to believe that

No. 14-60357

Brooks committed simple assault or resisted a lawful arrest,[2] the facts established by the testimony of Brooks and his family—which we must credit on a motion for summary judgment—do not. The district court therefore erred in granting summary judgment on this claim.

The district court also erred in granting summary judgment to Birchfield on the basis of qualified immunity with respect to Brooks's claim for retaliation in violation of the First Amendment. On that claim, Brooks must show that (1) he "engaged in constitutionally protected activity"; (2) Birchfield's actions caused Brooks "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) Birchfield's "adverse actions were substantially motivated against" Brooks's exercise of constitutionally protected speech. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). Viewing the evidence in the light most favorable to Brooks, a jury could conclude that Brooks's speech was constitutionally protected, that his arrest for cursing a police officer was an injury that would chill the speech of a person of ordinary firmness, and that Birchfield's decision to arrest Brooks was motivated against his exercise of protected speech. *See id.* at 258–61. On this view of the evidence, it also would have been clear to any reasonable officer that Birchfield's conduct was unlawful because (1) "government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable," and (2) as discussed, it is materially disputed whether Birchfield had a legitimate ground to arrest Brooks that could "take primacy over [Brooks's] right to avoid retaliation." *See id.* at 261–62. Thus, "qualified immunity turns on fact issues that must be resolved by further proceedings in the trial court." *Id.* at 262.

---

[2] "The offense of resisting arrest presupposes a lawful arrest. A person has a right to use reasonable force to resist an unlawful arrest." *Taylor v. State*, 396 So. 2d 39, 42 (Miss. 1981) (citation omitted).

No. 14-60357

Nonetheless, the district court correctly dismissed Brooks's claim that the officers used excessive force in violation of the Fourth Amendment when they arrested him—an issue we analyze "without regard to whether the arrest itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007). "To state a claim for excessive use of force, the plaintiff's asserted injury must be more than *de minimis*." *Id.* at 416. According to Brooks, he suffered abrasions to his hands and knees, some pain in his back and neck, and unspecified problems with his asthma. We have held injuries of this type to be *de minimis*. *See id.* at 417 ("[M]inor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force."); *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (concluding that allegations of "suffer[ing] 'acute contusions of the wrist,' and psychological injury from being handcuffed" stated only *de minimis* injuries). Brooks's additional allegation that he suffered an increase in his PTSD symptoms, which he does not support with medical evidence, does not suffice to survive summary judgment either. Although the record indicates that the officers knew Brooks was a veteran, there is no evidence they knew or should have known that he had PTSD. And "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Brooks's hidden susceptibility to psychological trauma, therefore, provides little support for his claim of having suffered a cognizable injury from the officers' conduct. *See Tarver*, 410 F.3d at 752 ("Tarver does not demonstrate that he suffered psychological injury from the handcuffing or that the handcuffing was excessive or unreasonable."); *Richman v. Sheahan*, 512 F.3d 876, 883 (7th Cir. 2008) (explaining that a claim of a "hidden vulnerability . . . would undermine the plaintiff's case that the defendants had used excessive force"). Because Brooks has not proffered evidence that the officers caused him

No. 14-60357

more than a *de minimis* injury, the district court did not err in granting summary judgment on his excessive force claim.

III.

For these reasons, we AFFIRM the district court's grant of summary judgment in favor of the police officers on Brooks's excessive force claim, but REVERSE its grant of summary judgment with respect to Brooks's unlawful arrest and First Amendment retaliation claims, and REMAND the case for further proceedings consistent with this opinion.

No. 14-60357

JAMES L. DENNIS, Circuit Judge, specially concurring:

I respectfully concur in the conclusions and judgment of the majority opinion for the reasons assigned in this special concurring opinion.

> Judicial opinions serve three functions. First, written opinions communicate a court's conclusions and the reasons for them to the parties and their lawyers. Second, when published, opinions announce the law to other lawyers, judges, academics, and the interested public. Finally, the preparation of a written opinion imposes intellectual discipline on the author, requiring the judge to clarify his or her reasoning and assess the sufficiency of precedential support.

FEDERAL JUDICIAL CENTER, JUDICIAL WRITING MANUAL 1 (1991).

The majority opinion is a summary and shortened version of the full-fledged opinion that I proposed for deciding this case. Because I believe my proposed full opinion more adequately performs the functions that judicial opinions should serve, I set forth part of it below as my reasons for concurring in the conclusions and judgment of the majority opinion.

## I.  Factual and Procedural Background

This litigation arises from two encounters between Brooks and Sergeant Birchfield on Brooks's front lawn on the same morning. The first encounter was a one-on-one situation between only Brooks and Sgt. Birchfield. The second encounter was between Brooks and Officers Birchfield and Spradling; and it was witnessed by Brooks's family. The defendant officers contend that during the first encounter Brooks committed the state crime of disorderly conduct; and that during the second encounter Brooks committed the additional state offenses of resisting arrest and simple assault on an officer. Brooks alleges that the officers violated his constitutional rights by unlawfully arresting him because they did not have reasonable grounds to believe that he had committed any of those crimes before they physically seized him.

## A.    First Encounter

On the morning of January 2, 2012, plaintiff Gregory Brooks called 911 from his home in West Point, Mississippi complaining that he had received harassing phone calls and messages from his sister in Atlanta, Georgia.  In response, defendant Sergeant Jimmy Birchfield of the West Point, Mississippi police department was dispatched to Brooks's home.  Sgt. Birchfield parked in the driveway and Brooks met him on the front lawn.  Brooks explained that his sister in Atlanta had been making harassing phone calls and leaving abusive messages, and he proceeded to play several examples of the messages for Sgt. Birchfield to hear.  The undisputed record evidence indicates that during the first encounter Brooks and Sgt. Birchfield were the only persons present and were on Brooks's private property; that Brooks became disappointed and angry when Sgt. Birchfield told him that he could not immediately press charges against his sister in Atlanta; and that Brooks used curse words and other disrespectful language in telling Sgt. Birchfield to get off his property; but that Brooks did not verbally or physically threaten Sgt. Birchfield or make any threatening, combative or other overt gesture toward him.[1]  Nevertheless, Sgt. Birchfield told Brooks that he would arrest Brooks

---

[1] On summary judgment we must consider the facts in the light most favorable to Brooks.  *See Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).  Sgt. Birchfield contends he told Brooks that he would have to go to the police station to press charges against his sister but that she could not be extradited from Georgia on a phone harassment charge.  According to Sgt. Birchfield, he suggested that Brooks just change his phone number, so Brooks may have thought Birchfield was being sarcastic, and Brooks responded by saying, "I don't like your punk ass no way" and "just get your mother fucking ass out of my yard."  Brooks, on the other hand, denied using any foul language other than "hell."  Sgt. Birchfield stated that he responded by telling Brooks, "you can't be cussing the police . . . now, at this point what you're doing is being disorderly . . . I'm trying to advise you on what we can do and what we can't do."  According to Sgt. Birchfield, when Brooks continued to curse at him, he responded by saying either "Mr. Brooks, you're fixing to go to jail for disorderly conduct" or "Mr. Brooks, you're going to be under arrest for disorderly conduct."

and charge him with disorderly conduct because Brooks had continued to use curse words in addressing Sgt. Birchfield after the officer ordered him to stop. Brooks next walked back into his house and Sgt. Birchfield pulled his squad car out of Brooks's driveway. During their first encounter, Sgt. Birchfield did not arrest or even touch Brooks, and Brooks did not touch or threaten Sgt. Birchfield.

Sgt. Birchfield then parked his squad car on the street in front of Brooks's house, called 911, and reported that Brooks "clearly, you know, he called us out here for telephone harassment, but he's clearly disorderly. He's very disorderly." Sgt. Birchfield asked that another officer be dispatched to Brooks's home to assist in arresting Brooks. While Sgt. Birchfield was awaiting the second officer, Brooks's wife and teenage daughter came out of the house and asked Sgt. Birchfield why Brooks could not press charges against his sister. Sgt. Birchfield informed them that he was going to arrest Brooks for disorderly conduct "due to the fact where he has been told not to curse the police the way he did . . . that's why he's going to jail because he was told." Brooks's wife asked Sgt. Birchfield if Brooks could just apologize, but Sgt. Birchfield responded "that is just too far over for disrespecting a police officer . . . I just can't accept, you know, you cursing a police when they're trying to help you at the same time." Brooks's wife and daughter went back in the house.

Soon afterwards, defendant Corporal William Spradling, also of the West Point police department, arrived on the scene. Sgt. Birchfield instructed Cpl. Spradling that they were going to arrest Brooks for disorderly conduct and they walked up to Brooks's house and knocked on the front door.

## B.    Second Encounter

Unbeknown to the officers, the Brooks family kept the front door permanently dead-bolted and used a side door for entrance and egress. Inside the house, Brooks, his wife, his teenage daughter, and his younger son heard a loud bang that frightened them. Mrs. Brooks testified that it "sounded like our front door was coming down." Brooks, who testified that he is an Iraq war veteran and suffers from Post-Traumatic Stress Disorder ("PTSD"), stated that he was "traumatized" by the banging on the door. He said that "it felt like the feeling like [he] was in Iraq again, like a big explosion."

The officers, knocking at the front door, called for Brooks to "come outside." Brooks exited the house by running or moving quickly from his den, through his garage, and out the side door of the garage. Brooks then went around the corner of the garage and headed toward the front door of the house. Brooks's wife, daughter, and son followed closely behind Brooks and witnessed his encounter with the officers. As Brooks walked toward the officers near the front door, he demanded to know why the "hell" they were banging on his door.[2]

### 1.    Dispute as to Material Facts

At this point, there is a sharp difference between the three Brookses' version of events and that of the police officers. Brooks, his wife, and his daughter testified as follows: After the officers knocked and called for Brooks to come out, they did not issue any other command to Brooks. When Brooks reached his front yard, he demanded to know why the officers were banging on his house, and Cpl. Spradling, who was closer to Brooks, grabbed Brooks's

---

[2] Sgt. Birchfield testified that Brooks said, "why your mother fucking ass knocking on my door[?] Didn't I tell you to get the fuck off my yard[?]" Cpl. Spradling's testimony was consistent with Sgt. Birchfield's. Brooks's wife, however, testified that the only expletive Brooks may have used was "hell."

11

arms and pulled them behind his back.[3]  Sgt. Birchfield then yelled at Brooks that he was going to arrest him for disorderly conduct, "because he can't call the police out to his house and then get upset because they wouldn't allow him to press charges."  Then, Sgt. Birchfield started to run at Brooks at full speed. Brooks pulled his arms away from Cpl. Spradling and put both hands up, palms open, in order to block the impact.  Sgt. Birchfield ran into Brooks's open hands. Sgt. Birchfield then yelled that he was going to charge Brooks with assaulting an officer.

On the other hand, each officer's account of the incident disputes that of the Brooks family and, in part, that of the other officer.  Cpl. Spradling testified that: He grabbed Brooks only after Brooks had first "shoved" Sgt. Birchfield. Sgt. Birchfield testified that: Almost as soon as Brooks exited his home, he told Brooks that he was under arrest for disorderly conduct and to put his hands behind his back.  Cpl. Spradling then grabbed Brooks's arm and began to place it behind Brooks's back.  Brooks pulled free from Cpl. Spradling's grasp, "came at" Sgt. Birchfield, and "pushed" Sgt. Birchfield with his hands.

## 2.    The Rest of the Material Facts Are Undisputed

The parties agree that, after that disputed stage of the second encounter, the officers both grabbed hold of Brooks, pushed him against the garage door, and vigorously forced him to the ground, resulting in abrasions on his hands and knees.  Once Brooks was on the ground, he was handcuffed and led to Cpl. Spradling's squad car.  While they were en route to the jail, Brooks began to complain of severe pain in his back and neck, so the officers had an ambulance take him to a hospital, where he was treated for abrasions

---

[3] There is some discrepancy in the record as to whether Cpl. Spradling pulled both of Brooks's arms behind his back, or just one.

on his hand and foot.  Brooks also alleges that the ordeal aggravated his PTSD symptoms.

## C.    Procedural History

Brooks brought claims under 42 U.S.C. § 1983 and various state laws against the City of West Point, Mississippi, as well as against Sgt. Birchfield and Cpl. Spradling in both their personal and official capacities. *Brooks v. City of W. Point*, 18 F. Supp. 3d 790, 794 (N.D. Miss. 2014).  Brooks later abandoned all claims against the city, all state-law claims, and all claims against the officers in their official capacities, leaving only his claims against the officers individually for Fourth Amendment unlawful arrest, First Amendment retaliatory arrest, and for excessive force.  *Id.*  Sgt. Birchfield and Cpl. Spradling (collectively, "Defendants") moved for summary judgment on the basis of qualified immunity and the district court granted their motions.  *Id.* Brooks appealed.

## II.    Elements of Summary Judgment and Qualified Immunity

We review a district court's summary judgment decision *de novo*.  *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

In this circuit, the defense of qualified immunity involves a shifting burden of proof.  *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992). "Although we sometimes short-handedly refer to only one party's burden, the law is that both bear a burden."  *Id.*  The defendant official first has the burden

to plead good faith and establish that he engaged in the relevant conduct while acting within the scope of his discretionary authority. *Id.* (citing *Saldana v. Garza*, 684 F.2d 1159, 1163 (5th Cir. 1982)). "Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." *Id.* (citing *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir. 1987); *United States v. Burzynski Cancer Research Inst.*, 819 F.2d 1301, 1310 (5th Cir. 1987)).

We employ a two-pronged inquiry to resolve questions of qualified immunity at summary judgment. "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" *Tolan*, 134 S. Ct. at 1865 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The order in which to address these two prongs rests in the reviewing court's discretion. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866 (citing *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (per curiam)). "This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249). "Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting FED. RULE CIV. PROC. 56(a)). "In making that determination, a

No. 14-60357

court must view the evidence 'in the light most favorable to the opposing party.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

## III.    Discussion

**A.    Fourth Amendment Unlawful Arrest Claim**

"The right to be free from arrest without probable cause is a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  Probable cause to arrest turns on whether an officer, at the time of arrest, "had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime."  *Mangieri*, 29 F.3d at 1016 (quoting *Duckett v. City of Cedar Park*, 950 F.2d 272, 278 (5th Cir. 1992)).  "Police officers who 'reasonably but mistakenly conclude that probable cause is present' are entitled to qualified immunity." *Id.* at 1017 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).  In *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004), the Supreme Court made clear that the pertinent question in a claim of false arrest under the Fourth Amendment is whether there was probable cause to arrest the plaintiff for a crime, regardless of the individual officer's subjective reason for making the arrest.  Applying the *Devenpeck* standard in the qualified immunity context, the inquiry is whether, given the facts known to Defendants, they could have reasonably believed they had probable cause to arrest Brooks for a crime he had committed or was committing.

Defendants point to three Mississippi statutes under which they contend they had probable cause to arrest Brooks: (1) disorderly conduct, Mississippi Code § 97-35-7; (2) resisting arrest, § 97-9-73; and (3) simple assault, § 97-3-7(1)(a).  Applying the summary judgment and qualified immunity principles to the materials in the record, however, it becomes clear that the movant

15

No. 14-60357

officers are not entitled to summary judgment dismissing Brooks's claims of unlawful arrest and retaliation for his speech, because the materials in the record show that (1) during his first encounter with Sgt. Birchfield, Brooks did not commit the offense of disorderly conduct, and (2) there is a genuine dispute as to whether, during the second encounter, Cpl. Spradling and Sgt. Birchfield unlawfully arrested Brooks before Brooks lawfully attempted to defend himself against their unconstitutional seizure of him. After discussing Defendants' meritless arguments as to disorderly conduct, resisting arrest, and assault, I will further address their claim of qualified immunity.

The Mississippi disorderly conduct statute provides, in pertinent part, that:

> (1) Whoever, with intent to provoke a breach of the peace, or under such circumstances as may lead to a breach of the peace, or which may cause or occasion a breach of the peace, fails or refuses to promptly comply with or obey a request, command, or order of a law enforcement officer, having the authority to then and there arrest any person for a violation of the law, to:
>
> > [Subparts (a) through (h) list various types of commands, orders or requests with which a person must comply, *e.g.*, "(a) Move or absent himself and any vehicle or object subject to his control from the immediate vicinity where the request, command or order is given."]
> >
> > (i) Act or do or refrain from acting or doing as ordered, requested or commanded by said officer to avoid any breach of the peace at or near the place of issuance of such order, request or command, shall be guilty of disorderly conduct, which is made a misdemeanor and, upon conviction thereof, such person or persons shall be punished by a fine of not more than Five Hundred Dollars ($500.00) or imprisonment in the county jail for not more than six (6) months, or by both such fine and imprisonment.

MISS. CODE ANN. § 97-35-7(1) (2006).

16

No. 14-60357

Thus, to convict a person of violating subsection (i) of Mississippi's disorderly conduct statute the state must prove that the accused failed to comply with an officer's command, order, or request to act, or not to act, as instructed, while the officer's command, order, or request had been issued to avoid a breach of the peace, and the accused either intended to provoke a breach of the peace, or knew that his non-compliance may cause or lead to a breach of the peace. *See id.* However, under the free speech principles recognized by both state and federal courts, the statute may not be applied to punish a person, or to justify his arrest, because of his spoken words only, unless his speech constitutes "fighting words" or falls within some other category of speech not protected by the First Amendment.

The Supreme Court has held that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). "Speech is often provocative and challenging. . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)). "The constitutional guarantees of freedom of speech forbid the States to punish the use of words or language not within narrowly limited classes of speech." *Gooding v. Wilson*, 405 U.S. 518, 521-22 (1972) (quotation marks omitted). "These include . . . 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). "'The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight.'" *Id.* at 573 (citation omitted). "Even as to such a class, however, because the line between speech unconditionally guaranteed and

17

speech which may legitimately be regulated, suppressed, or punished is finely drawn, in every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." *Gooding*, 405 U.S. at 522 (quotation marks, citations, and alterations omitted). "In other words, the statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Id.*

For example, in *Lewis v. City of New Orleans*, 415 U.S. 130 (1974), a state court found that the appellant had yelled obscenities and threats at an officer after the officer had asked the appellant's husband for his driver's license. *Id.* at 131 n.1. The appellant was convicted under a municipal ordinance making it unlawful "for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty." *Id.* at 132 (citation omitted). The Court vacated the conviction and invalidated the ordinance as facially overbroad. *Id.* at 134. "Critical to [the Court's] decision was the fact that the ordinance 'punishe[d] only spoken words' and was not limited in scope to fighting words that 'by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *Hill*, 482 U.S. 461-62 (quoting *Lewis*, 415 U.S. at 133); *see also Gooding*, 405 U.S. at 525 (invalidating Georgia breach-of-the-peace statute not limited to fighting words). Since the ordinance was "susceptible of application to protected speech," it was "constitutionally overbroad and therefore . . . facially invalid." *Lewis*, 415 U.S. at 134. Moreover, in his concurrence in *Lewis*, Justice Powell went so far as to question whether the "fighting words" exception applies in full force to speech directed at police officers, as "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less

18

likely to respond belligerently to 'fighting words.'" *Id.* at 135 (citation and quotation marks omitted). Later, in *Hill*, a majority of the Court cited favorably this language from Justice Powell. 482 U.S. at 462.

Mississippi courts have recognized and applied the *Chaplinsky* "fighting words" doctrine in considering whether spoken words alone, without threatening or combative conduct or gestures, may be punished under state statutes. *See Brendle v. City of Houston*, 759 So. 2d 1274, 1283-84 (Miss. Ct. App. 2000) (en banc) (Brendle's use of spoken words only, "I'm tired of this God d— police sticking their nose in s— that doesn't even involve them" and "f—," in addressing a police officer and another person, inside Brendle's place of business, were not "fighting words" so as to make him punishable under Mississippi public profanity or drunkenness statute) (Per Lee, J., with three judges concurring and two judges concurring specially); *Odem v. State*, 881 So. 2d 940 (Miss. Ct. App. 2004) (en banc) (holding that defendant Odem used fighting words because, in addition to directing curse words at a sheriff's deputy inside his office from which the deputy could not walk away, defendant engaged in combative conduct);[4] *Sendelweck v. State*, 101 So. 3d 734 (Miss. Ct. App. 2012) (finding probable cause to arrest Sendelweck for disorderly conduct because he walked across a public street to where a deputy was standing beside his parked vehicle and irately pointed his finger in the officer's face while

---

[4] Odem did not stop with simply expressing his displeasure. *See Odem v. State*, 881 So. 2d 940, 946 (Miss. Ct. App. 2004). He was combative and he created a stalemate that rose to the level of "fighting words" that were likely to inflict injury or incite an immediate breach of the peace. *Id.* at 948-49. Indeed, Odem indicated no intent to back down until the officer gave him his vehicle without following the proper procedure. *Id.* at 949.

yelling and cursing and refusing to step back when directed, which the officer believed to be threatening and combative gestures).

Although the Mississippi Supreme Court has not explicitly applied the *Chaplinsky* "fighting words" doctrine in construing the disorderly conduct statute, it reached a result consistent with the doctrine in *Jones v. State*, 798 So. 2d 1241 (Miss. 2001) (en banc). Defendant Jones was arrested after he publicly berated a sheriff's deputy outside a pit-stop grocery, calling him "a child killing motherfucker," yelling other profanity, accusing him of having had a hand in Jones's son's death, and refusing to leave the premises as the officer instructed. *Id.* at 1246. A majority held under state-law precedent that, based on Jones's spoken words only without any threatening conduct or gestures at that point, the deputy did not have sufficient evidence to believe that a breach of the peace was being threatened or a crime was about to be committed. *Id.* at 1248 (Per Diaz, J., with two judges concurring and two judges concurring in the result.) The four dissenting justices fully considered and discussed the *Chaplinsky* "fighting words" doctrine but found that Jones's actions and words were not protected speech. *Id.* at 1256-57 (Easley, J., dissenting). Needless to say, although most, if not all, judges in Mississippi, as elsewhere, recognize the constraints of the First Amendment "fighting words" doctrine, that does not mean they will always agree upon its specific application and result in every particular factual situation.

Applying the foregoing principles to the present case leads to the conclusion that, during the first encounter, under the undisputed facts, Brooks's spoken words only, which did not threaten harm to Sgt. Birchfield or anyone else, and which Brooks addressed only to Sgt. Birchfield within the confines of Brooks's own property, without any overt hostile act, conduct or gesture, although angry, distasteful and uncivil, simply could not reasonably

be thought to rise to the level of "'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 571. Nor were Brooks's spoken words "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). Consequently, the disorderly conduct statute could not be construed to punish Brooks's spoken words only under those circumstances, and the previous decisions of the Mississippi Supreme Court and Courts of Appeals are consistent with this conclusion.

Sgt. Birchfield points to nothing in the record that suggests that, during the first encounter, Brooks's words alone, under the circumstances then present, had any tendency to cause a fight or public disturbance or to interfere with the police in the performance of their duties. Rather, the record shows that during the first encounter, it is far more likely that Sgt. Birchfield took offense at Brooks's spoken words and decided to arrest him and charge him with disorderly conduct because of his speech alone. For example, Sgt. Birchfield testified that when Brooks told him "I don't like your mother fucking ass no way. Get the fuck on out of my yard,"[5] Sgt. Birchfield immediately said, "okay, Mr. Brooks, you're fixing to go to jail for disorderly conduct." And Sgt. Birchfield testified that Brooks was "arrested for cursing, saying, 'get your mother fucking ass off my yard. I told your punk ass.'"[6] Although Sgt. Birchfield's subjective reason for arresting Brooks is not controlling, his failure to give any reason for the arrest other than Brooks's speech alone highlights

---

[5] Brooks testified that he told Sgt. Birchfield "to get the hell out of [his] yard" and he denied using any other expletive.

[6] Brooks denied using this vulgar language. He stated that "hell" was the only expletive he used.

the lack of probative evidence that Brooks said or did anything to threaten Birchfield, other persons, or the peace of the public. Thus, for the purpose of deciding the summary judgment motion, we must conclude that Brooks was arrested for his spoken words only and that his speech did not constitute "fighting words," those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. *See Gooding*, 405 U.S. at 522.

With respect to the second encounter, there is a genuine issue of material fact as to whether Defendants, Sgt. Birchfield and Cpl. Spradling, had probable cause to arrest Brooks for a criminal offense prior to the moment that Cpl. Spradling arrested Brooks by seizing him and placing his arms behind his back. Although Sgt. Birchfield and Cpl. Spradling testified that Brooks lunged at and assaulted Sgt. Birchfield before Cpl. Spradling arrested Brooks, the three Brooks family members testified to the contrary. Brooks, his wife, and teenage daughter testified consistently that Cpl. Spradling grabbed Brooks and pinned his arms behind his back as soon as Brooks reached the front yard, and that it was only after Cpl. Spradling had seized Brooks that Sgt. Birchfield sprinted towards Brooks and Brooks put his open hands out to protect his body from the impact. Because in ruling on a summary judgment motion the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor, we must credit the testimony of Brooks, his wife and his daughter and infer that at the moment Brooks was arrested he had not given the officers any reason to believe that he had committed or was committing a criminal offense.

Defendants' arguments that they had probable cause to arrest Brooks for resisting arrest and assault on a police officer are also meritless. Under Brooks's version of the facts, which we must credit for summary judgment purposes, he had not committed a criminal offense prior to the time he was

22

arrested by Cpl. Spradling. Therefore, Cpl. Spradling and Sgt. Birchfield may not interpose their disputed version of the facts as a basis for deciding the motion for summary judgment.

Viewing the evidence in the light most favorable to Brooks, there are unresolved disputes of material fact as to whether Defendants violated Brooks's Fourth Amendment right to be free from arrest without probable cause. *See Tolan,* 134 S. Ct. at 1865. The next step in the qualified immunity analysis is to determine whether the right Defendants allegedly violated was "clearly established" at the time of the violation. *See id.* at 1866. Since qualified immunity protects those officers who "reasonably but mistakenly" violate an individual's constitutional rights, Defendants are entitled to qualified immunity if "reasonable officers in [Defendants'] position could have believed probable cause existed to arrest" Brooks. *Freeman v. Gore*, 483 F.3d 404, 415 (5th Cir. 2007). The record evidence, viewed most favorably to Brooks, indicates that no reasonable officer could have believed probable cause existed. Brooks has submitted competent evidence that his relevant conduct prior to arrest was limited to spoken words only. As discussed above, Brooks's speech—however disrespectful, abusive, or inappropriate—fell far short of "fighting words" or any other category of speech that can be punished by the state. *See Gooding*, 405 U.S. at 522. No reasonable officer in Defendants' position could have believed that the First Amendment or Mississippi law permitted Brooks to be arrested for his words alone. *See Jones*, 798 So. 2d at 1248. Accordingly, Defendants are not entitled to summary judgment based upon qualified immunity on Brooks's Fourth Amendment unlawful arrest claim.

No. 14-60357

## B.     First Amendment Retaliation for Speech Claim

Brooks further claims that Sgt. Birchfield violated his First Amendment free speech rights by causing Brooks to be arrested in retaliation for Brooks's spoken words to Sgt. Birchfield in their first encounter.[7]  To establish that he was subjected to retaliation in violation of his First Amendment rights, Brooks must show that (1) he "engaged in constitutionally protected activity"; (2) Sgt. Birchfield's actions caused Brooks "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) Sgt. Birchfield's "adverse actions were substantially motivated against" Brooks's exercise of constitutionally protected speech.  *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).  Sgt. Birchfield has asserted qualified immunity on this claim, which requires an analysis of "whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right" and "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Keenan*, 290 F.3d at 261 (quotation marks and citations omitted).  In *Keenan*, two former deputy constables, Keenan and Przybylski, brought a § 1983 suit asserting that their First Amendment rights were violated when they suffered retaliation for their protected speech.  *Id.* at 256.  Not long after they publicly exposed possible wrongdoing by the county constable, Keenan and Przybylski were subjected to a traffic stop by several officers with guns drawn that led to the issuance of a minor traffic ticket, later dismissed, and Keenan was subsequently charged with misdemeanor "deadly conduct" under suspicious circumstances.  *Id.* at 256-59.  The district court granted summary judgment based on qualified immunity in favor of the defendant officers, but

---

[7] Brooks does not include Cpl. Spradling as a defendant in his First Amendment claim.

we reversed on appeal.  First, we concluded that Keenan and Przybylski were engaged in protected activity, suffered an injury that would chill a person of ordinary firmness, and had offered sufficient evidence that the officers' conduct was substantially motivated by the plaintiffs' protected speech.  *Id.* at 261. Moving to qualified immunity's second prong, we stated that "[i]f no reasonable police officer could have believed that probable cause existed for the law enforcement actions of [the defendant officers] against the plaintiffs, then their retaliation violated clearly established law in this circuit."  *Id.* at 262.  This was because "government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable" in light of clearly established law, but "the objectives of law enforcement take primacy over the citizen's right to avoid retaliation" where there is a legitimate ground to charge the plaintiff with a crime.  *Id.* at 261-62 (citing *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996) and *Mozzochi v. Borden*, 959 F.2d 1174, 1179 (2d Cir. 1992)).  Since a genuine dispute of fact made it impossible for us to determine whether probable cause existed, "qualified immunity turn[ed] on fact issues that [had to] be resolved by further proceedings in the trial court" and we reversed the district court's summary judgment in favor of the defendants.  *Id.* at 262.

Here, Brooks has proffered sufficient evidence that Sgt. Birchfield violated his First Amendment rights because, under Brooks's version of events, his speech was constitutionally protected activity, his arrest was an injury that would chill the speech of a person of ordinary firmness, and he has offered ample evidence that Sgt. Birchfield's decision to arrest Brooks was

substantially motivated against Brooks's exercise of protected speech.[8] *See id.* at 261. Next, we must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). As we have stated, "government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable." *Id.* Furthermore, as discussed in Part III.A., *supra*, Sgt. Birchfield's summary judgment arguments that he had probable cause to arrest Brooks are without merit. In light of clearly established federal law, no reasonable officer in Sgt. Birchfield's position could have believed he could arrest Brooks in retaliation for Brooks's spoken words only that under the circumstances clearly did not amount to "fighting words." *See id.* at 262. Thus, Sgt. Birchfield was not entitled to qualified immunity on Brooks's First Amendment retaliatory arrest claim.

## C.   Fourth Amendment Excessive Force Claim

I concur fully in the majority opinion's disposition of Brooks's excessive force claim because it is essentially identical to that which I proposed in my full-length opinion.

## IV.   Conclusion

For these reasons, I concur in the conclusions and judgment of the majority opinion.

---

[8] For example, Sgt. Birchfield charged that Brooks "willfully and unlawfully, said to officer Birchfield to get his punk ass off his property" and refused to comply with a request to calm down. Sgt. Birchfield also told Brooks's wife that he would arrest Brooks because "he has been told not to curse the police the way he did . . . that's why he's going to jail."